## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| THE AZTEC FUND HOLDING, INC., *et al.*,[1] | § § | Case No. 24-90436 (CML) |
| Debtors. | § § § | Jointly Administered |

## DECLARATION OF CHARLES HADDAD IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Charles Haddad, hereby declare under penalty of perjury:

1.      My name is Charles Haddad. I am over the age of eighteen years and am qualified to make this Declaration.  I am the President of each of the twelve debtors and debtors-in-possession (the "Debtors") in these bankruptcy cases.  I have been President of each of the Debtors since their inception. Further, I have been investing in or managing commercial real estate assets for approximately 30 years.

2.      I am familiar with the Debtors' business operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: The Aztec Fund Holding, Inc. (7839); Aztec OME Holdings, Inc. (1731); OME 2001 Mark Center, LLC; OME Bowie Corporate Center, LLC; OME Lake Vista III & IV, LLC; OME Windward Oaks, LLC; TAF 5775 DTC, LLC; TAF Intellicenter, LLC; TAF Lakeside II, LLC; TAF Pinnacle Park, LLC; TAF Pinnacle Park Land, LLC; and TAF Royal Tech, LLC.  The Debtors' service address is: Paseo de los Tamarindos 90, Torre 2 - Piso 27, Bosque de las Lomas, CDMX 05120.

this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3.      At a high level, the Debtors own and operate commercial real estate including office buildings and undeveloped land.  Each of the Debtors, save one, is a borrower or guarantor under a now-accelerated loan with Bank of America, N.A. ("BANA").  Despite efforts to restructure the BANA loan out of court, a pending foreclosure on one of the Debtors' properties has necessitated the filing of the above-styled chapter 11 bankruptcy cases (the "Chapter 11 Cases").

4.      To further familiarize the Court with the Debtors, their business, the circumstances leading to the Chapter 11 Cases, and the relief the Debtors are seeking in the motions filed following filing of the petitions (collectively, the "First Day Motions"), I have organized this declaration into three sections, as follows:

- Part I describes the Debtors' current corporate structure, assets and operations;

- Part II describes the BANA loan and the events leading to the filing of these Chapter 11 Cases; and

- Part III describes the First Day Motions and the support for the same.

## I.      CORPORATE STRUCTURE, ASSETS AND OPERATIONS

5.      The Debtors manage a portfolio of commercial office buildings and undeveloped land located in major metropolitan and suburban areas in Texas, Virginia, Maryland, Georgia, and Colorado. The portfolio consists of four office building properties representing nearly 630,000 square feet of office space and one additional office-adjacent, 5.5 acre, undeveloped parcel of land. The Debtors' enterprise was founded in Mexico City, Mexico in 2015.  The Debtors' contract for management services, and the management team is located in Mexico City.

A.      **Corporate Structure and Investments**

6.      The Aztec Fund Holding, Inc. ("TAF Holding") and Aztec OME Holdings, Inc. ("OME Holdings" and, together with TAF Holding, the "Holding Companies") are each Delaware corporations and are the parents of the remaining Debtors.  TAF Holding is the sole member of each of the Debtor entities with a name beginning in "TAF," and OME Holdings is the sole member of each of the Debtor entities with a name beginning in "OME."

7.      In particular, TAF Holding is the sole member of five Debtor Texas limited liability companies: (i) TAF Pinnacle Park, LLC ("TAF Pinnacle Park"), (ii) TAF Pinnacle Park Land, LLC ("TAF Land"), (iii) TAF Royal Tech, LLC ("TAF Royal Tech"), (iv) TAF Intellicenter, LLC ("TAF Intellicenter"), and (v) TAF Lakeside II, LLC ("TAF Lakeside"); and one Colorado limited liability company, TAF 5775 DTC, LLC ("TAF DTC"). TAF Holding is also the sole member of TAF Westway Plaza, LLC, which is not a debtor in these Chapter 11 Cases, nor is it a borrower or guarantor under the BANA Loan.

8.      Similarly, OME Holdings is the sole member of the following four limited liability companies formed in the state indicated parenthetically: (i) OME Windward Oaks, LLC (GA) ("OME Windward"), (ii) OME Lake Vista III & IV, LLC (TX) ("OME Lake Vista"), (iii) OME Mark Center, LLC (VA) ("OME Mark Center"), and (iv) OME Bowie Corporate Center, LLC (MD) ("OME Bowie").

9.      TAF Holding is wholly owned by US TAF S.A.P.I. de C.V., a Mexican entity, that is in turn wholly owned by a Mexican trust identified as The Aztec Fund F/2356 Banco INVEX. OME Holdings is owned by TAF OME S.A.P.I. de C.V., a Mexican entity, and Fenicia International, LP, a Canadian entity, with approximate ownership interests of 76% and 24%, respectively.  TAF OME S.A.P.I. de C.V. is wholly owned by a Mexican trust identified as The

Aztec Fund F/3949 Banco INVEX.  TAF and OME are each managed by CFG Administración GP, S.A. de C.V. ("CFG"), a Mexican entity, and OME GP, S.A. de C.V. ("OME GP"), a Mexican entity, respectively.  CFG and OME GP provide management services to the TAF entities and OME entities, which services include oversight of accounting, finance, property management, and listing/brokerage services.

10.     TAF Holding and OME Holdings have the same officers and directors:

|  | **TAF Holding** | **OME Holding** |
|---|---|---|
| **Officers** | <ul><li>Charles Haddad (President)</li><li>Alejandro Fernandez Navarro (VP)</li><li>Victor F. Herrera Prats (Secretary)</li><li>Farid Mena Valdez (Treasurer)</li></ul> | <ul><li>Charles Haddad (President)</li><li>Alejandro Fernandez Navarro (VP)</li><li>Victor F. Herrera Prats (Treasurer)</li><li>Farid Mena Valdez (Secretary)</li></ul> |
| **Directors** | <ul><li>Charles Haddad</li><li>Alejandro Fernandez Navarro</li><li>Farid Mena Valdez</li><li>Victor F. Herrera Prats</li></ul> | <ul><li>Charles Haddad</li><li>Alejandro Fernandez Navarro</li><li>Farid Mena Valdez</li><li>Victor F. Herrera Prats</li></ul> |

11.     The Debtors share the same management team, offices, and accounting and back-office support.  As further described below, all the Debtors, except TAF Land, are jointly and severally liable as borrowers or guarantors under the loan with BANA.

12.     Since inception, the TAF and OME portfolios have been capitalized with approximately $80 million in equity contributions and approximately $45 million in unsecured debt from The Aztec Fund Trusts (plus an additional approximate $7.7 million in equity and approximate $9.8 million in unsecured debt from Fenicia International, LP to OME Holdings).  The equity and debt investors to The Aztec Fund Trusts are principally individuals or closely held companies, by and through Mexican tax-sensitive trusts or estates.  The identity of the investors between the trusts is identical, save for allocation differences between the trusts and certain OME

4

investors that did not participate in TAF. Absent a successful restructuring, it is likely that all or substantially all of the investments will be lost.

**B.    Debtors' Assets**

13.    The Debtors' principal assets are the commercial office buildings and real property identified in the chart below. The Debtors' other assets include cash, prepaid amounts and deposits (including retainers for bankruptcy professionals), other miscellaneous property, and potential litigation claims.

|  | Owner | Property Name | Primary Street Address | Occupancy |
|---|---|---|---|---|
| 1. | TAF DTC | 5775 DTC | 5775 DTC Boulevard<br>Greenwood Village, CO 80111 | 35% |
| 2. | TAF Land | Pinnacle Park Land | 4252 IH-30<br>Dallas, Texas 75211 | N/A |
| 3. | OME Windward | Windward Oaks I & II | 5895 Windward Parkway<br>Alpharetta, GA 30005 | 96% |
| 4. | OME Mark Center | Mark Center | 2001 North Beauregard<br>Alexandria, VA 22311 | 100% |
| 5. | OME Bowie | Bowie Corporate Center | 4321 Collington Rd<br>Bowie, MD  20716 | 100% |

**C.    The Debtors' Operations**

14.    The Debtors operate the commercial office buildings in partnership with third-party operator, Hines Interests Limited Partnership ("Hines"). The Holding Companies receive back-office support and traditional management services by and through management services contracts with CFG and OME GP.  Certain Debtors collect rents on a monthly basis from office building tenants. The Debtors' cost structure is comprised of certain fixed and variable costs related to commercial property management and ownership. Aside from debt service, the Debtors' largest expense categories are, generally, property maintenance and capital expenditures, property

management fees, real-estate taxes, utilities, building security fees, and insurance premiums. The Debtors contract with CFG and OME GP for services, thus, the Debtors do not have any direct employees. Accordingly, there is no expense incurred by the Debtors for either employee wages and salaries or employee benefit plans.

## II.        BANA LOAN AND EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    The BANA Loan

15.    BANA, as administrative agent and sole lender, is party to that certain *Consolidated, Amended and Restated Loan Agreement* dated as of November 14, 2019, as modified by a *Loan Extension and Modification Agreement* dated as of February 24, 2023 (the "Loan Agreement") with each of the Debtors other than the Holding Companies and TAF Land (collectively, the "Borrowers").  Each of the Borrowers executed and delivered promissory notes in the aggregate principal amount of $202,250,000 (the "Notes" and together with the Loan Agreement and related documents, the "Loan Documents") evidencing their obligations to BANA in connection with a loan or loans in such original principal amount (the "Loan").

16.    The Loan was secured by deeds of trust in the office building properties, assignments of leases and rents, assignment of the Hines property management agreements by the Borrowers, and a lien on certain bank accounts. For clarity, TAF Land is not a Borrower and BANA does not have a security interest in the undeveloped Pinnacle Park Land. The Pinnacle Park Land remains an unencumbered asset.

17.    Pursuant to that certain *Amended and Restated Guaranty Agreement*, the Holding Companies issued certain guaranties to BANA including a springing guaranty of repayment of the Loan upon the commencement of these Chapter 11 Cases. The Debtors have no other material secured debt obligations.

6

**B.      Pandemic Effects and Vacancy**

18.      The COVID-19 pandemic had, and continues to have, a significant negative impact on the Debtors' business. Beginning in March 2020, the federal government and other state and local governments issued restrictions on travel, public gatherings, and other events in addition to social distancing guidelines. These governmental restrictions and required shutdowns resulted in the closure of businesses—including business of Debtors' tenants—and gave rise to the "work from home" movement that remains prevalent approximately four years from the start of the COVID shutdown.

19.      Though statistics and studies vary by agency, it is undeniable that remote work has reduced but remains a lasting effect, likely being three or four times more prevalent than in 2019. Similarly, hybrid work arrangements are even more prevalent.

20.      The result – commercial real estate, particularly buildings that provide traditional back-office facilities for businesses, have suffered and continue to suffer sustained vacancies and challenging leasing negotiations.

**C.      Large Tenant Changes at Certain Properties**

21.      Certain of Debtors' properties were impacted by market change more than others. Pinnacle Park, for instance, was acquired in 2015 with a single anchor tenant, occupying substantially all of the leasable space. In 2020, the Company agreed to tenant's demands for additional parking and acquired Pinnacle Park Land.  Ultimately, the efforts were to no avail because tenant did not execute a lease extension, and it vacated the premises in 2022.

22.      In 2021, a tenant relocated its headquarters and vacated the entire Royal Tech property.  In 2022, a tenant significantly reduced its leased space in the DTC property (from 70% of the building to 18%), resulting in a total occupancy as of the Petition Date of 35%.

**D.      Interest Rate and Credit Market Tightening**

23.     Because the Loan has a floating interest rate, rising interest rates exacerbated Debtors' vacancy-driven revenue problems.  Accordingly, as rates have risen since the COVID pandemic and tenancy dropped, loan servicing costs have rendered certain properties—and, potentially, certain geographical locations—unprofitable for traditional commercial real estate business.

24.     In my experience, market conditions for commercial real estate—including the Debtors' properties—are substantially stabilized; however, inflationary pressures and working environment changes persist causing economic and certain commercial real estate operating conditions to remain below pre-pandemic levels.

**E.      Challenges with the BANA Loan**

25.     At the beginning of 2023, each of the Borrowers held office building properties pledged as collateral for the Loan.  As briefly referenced above, in February 24, 2023, BANA, the Borrowers and the Holding Companies entered into that certain *Loan Extension and Modification Agreement*, dated February 24, 2023 (the "BANA Modification Agreement"), which was made effective as of November 14, 2022 (the original maturity date).  Among other things, the BANA Modification Agreement (a) extended the Loan maturity date to November 14, 2024; (b) replaced LIBOR with SOFR; (c) resolved a debt service coverage ratio default, and (d) waived certain default interest accrual.

26.     In return, BANA required the Borrowers to pay, and the Borrowers did pay, to reduce the principal balance of the loan from $202,250,000.00 to $195,000,000.00.  BANA additionally required the Borrowers to make additional sizeable equity investments: (a) $3 million by March 10, 2023, and (b) $7 million by June 30, 2023.  The March equity infusion was timely

completed. Debtors also made two contributions of $500,000 each in February 2024, but did not make the remainder of the June equity infusion.

27.      The parties entered into a *Loan Forbearance Agreement* dated July 1, 2023 (as amended pursuant to that certain *Amendment to Loan Forbearance Agreement* dated August 9, 2023, the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, BANA agreed to forbear from exercising or enforcing its rights and remedies under the Loan with respect to the event of default arising from the unpaid June equity infusion. The first forbearance period terminated on October 9, 2023.

28.      The Debtors continued to market certain underperforming office building properties, namely those owned by TAF Pinnacle Park[2] and TAF Royal Tech. The Debtors created a competitive bidding process for Pinnacle Park and, in early December 2023, informed BANA of a proposed sale. In support of the sales process, BANA entered into an *Amended and Restated Loan Forbearance Agreement*, effective as of December 14, 2023, with the Borrowers (the "Second Forbearance Agreement").

29.      The Second Forbearance Agreement included an agreed-upon, reduced release price for the deed of trust securing Pinnacle Park. The Second Forbearance Agreement also provided that the forbearance termination date would occur on the earlier of (1) January 31, 2024, or (2) the occurrence of any one or more events of termination set forth in the Forbearance Agreement. Unfortunately, the competitive bidding process did not yield bids above the floor value set by BANA to support closing, resulting in an unsuccessful auction.

30.      On February 21, 2024, BANA sent the Borrowers and the Holding Companies notices of default and notice of acceleration of the Loan. On March 21, 2024, BANA sent the

---

[2] The Pinnacle Park office building that was owned by TAF Pinnacle Park is a separate property from the undeveloped Pinnacle Park land owned by TAF Land.

Borrowers and the Holding Companies a notice of intent to pursue foreclosure on all of the Borrower properties.

31.     On May 7, 2024, BANA foreclosed upon the real property of TAF Royal Tech, TAF Intellicenter, OME Lake Vista, TAF Pinnacle Park and TAF Lakeside and offered each property for sale at auction.  In each case, BANA credit bid, with TAF Royal Tech being sold to a third party (on information and belief, at $1 over credit bid) and the other properties transferring to BANA for a total credit bid of $77,340,000.  In total, the foreclosures resulted in a decrease of the principal amount of the Loan to approximately $108,000,000 (assuming the winning foreclosure bid amounts were applied to principal).  The Debtors reluctantly allowed BANA to complete the foreclosures because the subject properties were among the most distressed—in terms of occupancy, capital improvement and tenant improvement requirements approximating $30 million under the market conditions—in the portfolio.

32.     On July 3, 2024, OME Windward and the Holding Companies were notified that BANA intended to foreclose on Windward Oaks on August 6, 2024.

33.     According to letter from BANA dated July 23, 2024, the approximate aggregate amount owed to BANA pursuant to the Loan is approximately $114,335,148.91, inclusive of outstanding principal amount of $109,959,999, unpaid interest in the amount of $2,202,259.11, deferred interest fee in the amount of $1,225,377.75, and out-of-pocket legal fees of $917,513.05 (the "Prepetition BANA Obligation").  The Debtors reserve all rights to verify and, as appropriate, contest these amounts.

**F.      Ongoing Efforts**

34.     Based on occupancy reduction, carry costs, and other market conditions, the Debtors are planning to sell DTC and Pinnacle Park Land.  Prepetition, TAF Holding and TAF

DTC engaged CBRE to market and sell the DTC property. Prior to the foreclosure, TAF Pinnacle Park and TAF Land negotiated and entered into agreements for the sale of the Pinnacle Park commercial office building and Pinnacle Park Land for a total combined purchase price of $13 million, subject to terms and conditions including a ninety (90) day inspection period. BANA's foreclosure on the Pinnacle Park office building disrupted the potential sale. Nonetheless, the Debtors have continued to explore opportunities with respect to Pinnacle Park Land, and have received purchase offers prior to the Petition Date, culminating in an executed contract (pending this Court's approval and other conditions to closing) to sell Pinnacle Park Land for $3 million.

### G.    Retention of Professionals

35.    In the months and weeks leading up to the Petition Date, the Debtors engaged restructuring professionals to further negotiations with BANA and to prepare these Chapter 11 Cases on a dual track basis. The Debtors restructuring and bankruptcy professionals include: Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"), as restructuring and bankruptcy counsel; Getzler Henrich & Associates LLC, as restructuring and bankruptcy financial advisor; and Hilco Real Estate Appraisal, LLC, as real estate appraiser. All bankruptcy and restructuring professionals will seek to be retained as estate professionals in these Chapter 11 Cases.

### III.    FIRST DAY MOTIONS

36.    The Debtors filed a number of First Day Motions in these Chapter 11 Cases seeking orders granting various forms of relief intended to stabilize the Debtors' business, facilitate the efficient administration of the Chapter 11 Cases, minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' business, and ensure that their reorganization strategy can be implemented with limited disruptions. Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their

business with minimal disruption and thereby preserving value for the Debtors' estates and various stakeholders.

37.     I understand the Debtors intend to seek the entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules of the United States Bankruptcy Court, and the Complex Case Procedures for the Southern District of Texas. If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

38.     The First Day Motions include the following:

## A.     Administrative Motions

a.     <u>Joint Administration Motion</u>

39.     Pursuant to the *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*, the Debtors request entry of an order directing consolidation of the Chapter 11 Cases for procedural purposes only. The Debtors are under common management, share substantially common owners, and all (excluding TAF Land) are obligors or guarantors under the Loan. I believe joint administration of the Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The Office of the United States Trustee for Region 7 (the "<u>U.S. Trustee</u>") and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

40.    I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

b. Consolidated Creditor Matrix Motion

41.    Pursuant to the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of 30 Largest Unsecured Creditors; (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information; and (III) Granting Related Relief* (the "Consolidated Creditor Matrix Motion"), the Debtors are seeking entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix (the "Consolidated Creditor Matrix") and a consolidated list of the Debtors' thirty (30) largest unsecured creditors (the "Consolidated Top 30 Creditors List"), (ii) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases and other information, and (iii) granting related relief.

42.    I am advised that Bankruptcy Rule 1007(a) requires each Debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top unsecured creditors for each Debtor. Because the preparation of separate lists of creditors for each of the Debtors would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, because creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists

for each of the Debtors. The Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service.

43.     Finally, I am advised that, in compliance with the requirements of Bankruptcy Rule 2002(a), of which I have been advised, the Debtors, through Stretto, Inc. ("Stretto"), their proposed claims and noticing agent, propose to serve the Notice of Commencement (as defined in the Consolidated Creditor Matrix Motion) on all parties entitled to notice of commencement of the Chapter 11 Cases, to advise them of commencement of the Chapter 11 Cases and the section 341 meeting of creditors. I believe service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but will also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

44.     Based on the foregoing, I believe that the relief requested in the Creditor List Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

　　　　　　c.　Stretto Retention Application

45.     Pursuant to the *Emergency Ex Parte Application for Entry of an Order Authorizing Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent* filed concurrently herewith (the "Claims Agent Retention Application"), the Debtors request entry of an order appointing Stretto as the claims, noticing, and solicitation agent (the "Claims and Noticing Agent") for the Debtors in the Chapter 11 Cases, effective as of the Petition Date.

46.     As more fully described in the Claims Agent Retention Application, the Claims and Noticing Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors,

equity security holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Chapter 11 Cases pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

47.     I am informed by Munsch Hardt that the Debtors will be required to provide notice to hundreds of parties in interest during the pendency of the Chapter 11 Cases. The appointment of Stretto as the Claims and Noticing Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Stretto as the Claims and Noticing Agent in the Chapter 11 Cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

     d.   Schedules and Statements Motion

48.     Pursuant to the *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules and Statements and Granting Related Relief* (the "Schedules and Statements Motion"), the Debtors request an order extending the deadline by which the Debtors must file the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional sixteen (16) days, for a total of thirty (30) days from the Petition Date, through and including September 4, 2024.

49.     I believe ample causes exists to grant the requested extensions. I understand the ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting and cash management systems, and to prepare the Schedules and Statements, the Debtors must compile information from those books and records, documents relating to the claims of numerous and diverse creditors, and the Debtors' assets and contracts. Collecting the necessary information requires a very significant expenditure of time and effort on the part of the Debtors' management team and their professional advisors in the near term.

50.     I believe that the extensive amount of information that must be assembled and compiled, the multiple places where the information is located, and the significant number of management team and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time. Moreover, an extension will not harm creditors or other parties in interest.

51.     Based on the foregoing, I believe that the relief requested in the Schedules Extension Motion is reasonable under the circumstances, is in the best interests of the Debtors, their estates, and all other parties in interest, and should be granted in all respects.

**B.     Operational Motions**

a.     Cash Management Motion

52.     Pursuant to the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management System in the Ordinary Course of Business, and (C) Continue to Perform Intercompany Transfers; and (II) Granting Related Relief* filed contemporaneously herewith (the "Cash Management Motion"), the Debtors request authority to: (i) continue operating the Debtors' existing cash management system (the "Cash

Management System"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms; (ii) implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in, or control of, the Cash Management System, including, without limitation, opening new or closing existing bank accounts owned by the Debtors; (iii) continue to perform under and honor intercompany transactions in the ordinary course of business; and (iv) honor and pay all prepetition and postpetition Bank Fees (as defined below) payable by the Debtors.

53.     The Cash Management Motion also requests that the Court authorize and direct the financial institutions at which the Debtors maintain various bank accounts to (i) continue to maintain, service, and administer the Debtors' bank accounts, and (ii) debit the Debtors' bank accounts in the ordinary course of business on account of (a) electronic transfers (including wire transfers, book transfers, and automated clearinghouse transfers ("ACH Transfers") or checks drawn on the Debtors' bank accounts or (b) all amounts owed to the Banks for maintenance of the Bank Accounts (as defined below), including, without limitation, any bank fees, credit card processing fees, service charges and other fees, costs, charges, chargebacks, and expenses associated with the Debtors' Bank Accounts and the Cash Management System, whether arising before, on, or after the commencement of the Chapter 11 Cases.

54.     As described more fully in the Cash Management Motion, in the ordinary course of their business, the Debtors have historically used the Cash Management System to collect, transfer, and disburse funds generated by their operations. The Cash Management System is tailored to meet the Debtors' needs. The Cash Management System allows the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds

and the development of accurate account balances. It also enables the Debtors to facilitate cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately twenty-seven (27) bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "Bank Accounts") owned by the Debtors and maintained at either BANA or any other Authorized Depository (defined below) at which the Debtors may open any post-petition Bank Accounts (collectively, the "Banks").

55.    The Cash Management System is generally comprised of four types of bank accounts: (1) depository accounts for rent collections; (2) operating accounts to which allocated, budgeted amounts are transferred and from which the property level expenses, subject to review and approval by the management of the Debtors, have historically been paid by Hines; (3) reserve accounts for specific expense categories, *i.e.*, capital expenditures, tenant improvements, leasing commissions, and property tax payments; and (4) sweep accounts established under agreements with BANA.

56.    Of the Debtors' twenty-seven (27) Bank Accounts, all are maintained at BANA, an authorized bank depository (an "Authorized Depository") under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "UST Operating Guidelines") published by the U.S. Trustee.

57.    The Debtors incur periodic service charges and other fees, charges, costs, and expenses in connection with the maintenance of the Cash Management System (the "Bank Fees"). The Bank Fees are paid monthly and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Banks. I believe that payment of any prepetition Bank Fees, if any, is in the best interests of the Debtors and all parties-in-interest in the Chapter 11 Cases

because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed.

58.    At the individual property level, the Debtors' contract for the property management services of Hines Interests Limited Partnership. Hines receives property level invoices and requests the applicable Debtor transfer funds to the applicable operating account and authorize Hines to pay out the amounts. Hines has signatory authority over the Debtors' operating bank accounts to facilitate the payment of vendors, service providers, utilities, and other individual property related expenses. Any disruption of Hines' ability to directly pay post-petition related expenses from the Debtors' operating bank accounts as authorized by the Debtors have an immediate adverse effect on the Debtors' business and operations to the detriment of the Estates and all of the Debtors' stakeholders.

59.    The Debtors use the Cash Management System to collect, transfer, and distribute funds and to facilitate cash monitoring, forecasting, and reporting for the entire enterprise. The Cash Management System is typical for a complex real estate operation of similar size and is used to manage the cash flow of operating in a cost-effective, efficient manner. Maintaining the Cash Management System ensures that the Debtors' continue to have maximum control and access over the Debtors' finances. Accordingly, the continued usage of the Cash Management System is in the best interests of the Estates, as it will avoid unnecessary expense, ensure the protection of the Estates' funds, and provide the Debtors and their creditors accurate information concerning receivables and payables.

60.    The Debtors operate the following Bank Accounts:

| | Debtor/Property | Cash Management Bank | Account Number Ending | Account Type |
|---|---|---|---|---|
| 1. | Windward Oaks | BANA | 7594 | Depository |
| 2. | Windward Oaks | BANA | 7581 | Operating |
| 3. | Lake Vista II & IV | BANA | 3973 | Operating |
| 4. | Lake Vista II & IV | BANA | 3986 | Depository |
| 5. | Lake Vista II & IV | BANA | 7827 | Property Tax Escrow |
| 6. | Mark Center | BANA | 6066 | TI/LC Reserve |
| 7. | Mark Center | BANA | 5698 | Operating |
| 8. | Mark Center | BANA | 5708 | Depository |
| 9. | Bowie Corporate Center | BANA | 5685 | Depository |
| 10. | Bowie Corporate Center | BANA | 5672 | Operating |
| 11. | OME | BANA | 8234 | Other Miscellaneous |
| 12. | OME | BANA | 3184 | Sweep |
| 13. | Pinnacle Park Land | BANA | 5368 | Other Miscellaneous |
| 14. | Pinnacle Park | BANA | 8959 | Property Tax Escrow |
| 15. | Pinnacle Park | BANA | 8962 | Depository |
| 16. | Pinnacle Park | BANA | 8503 | Operating |
| 17. | Royal Tech | BANA | 8991 | Operating |
| 18. | Royal Tech | BANA | 9000 | Depository |
| 19. | Intellicenter | BANA | 9068 | Depository |
| 20. | Intellicenter | BANA | 9055 | Operating |
| 21. | 5775 DTC | BANA | 9110 | Operating |
| 22. | 5775 DTC | BANA | 9123 | Depository |
| 23. | Lakeside II | BANA | 9026 | Depository |
| 24. | Lakeside II | BANA | 9013 | Operating |
| 25. | TAF | BANA | 8920 | Other Miscellaneous |
| 26. | TAF | BANA | 3171 | Sweep |
| 27. | TAF | BANA | 2901 | CAPEX/TI/LC |

61.     The Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (the "Bank Fees"). In most instances, the Bank Fees are automatically debited from the applicable Bank Account. The Debtors seek authority to pay the outstanding prepetition Bank Fees, if any, and to continue to pay the Bank Fees in the ordinary course of business on a postpetition basis.

62.     The Debtors use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "Books and Records"). I believe that granting the Debtors authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as chapter 11 debtors in possession— rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records would avoid a material disruption to Debtors' business operations that would result from a disruption of the Cash Management System and avoid unnecessary expense.

63.     The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions. Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

64.     I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

b.      Utilities Motion

65.      Pursuant to *Debtors' Emergency Motion for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief filed concurrently herewith* (the "Utilities Motion"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the utility providers, (ii) establishing procedures for resolving objections by the utility providers relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the utility providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of the Chapter 11 Cases or outstanding prepetition invoices, and (iv) granting related relief.

66.      As more fully described in the Utilities Motion, in the ordinary course of business, the Debtors incur expenses for, among other things, electricity, natural gas, water and sewage, trash collection, and other similar services. I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.

67.      Based on their monthly average for the twelve months prior to the Petition Date, the Debtors estimate that on average, they spend approximately $111,406 per month on utility services. To provide additional assurance of payment, the Debtors propose to deposit cash into an account at Bank of America or other approved depository in an amount equal to approximately one half of the Debtors' average monthly cost of utility services, calculated based on the historical average of payments made to the utility providers over the 12-month period ending on June 30, 2024, subject to certain adjustments (the "Adequate Assurance Deposit"). The Debtors estimate

that the Adequate Assurance Deposit would total approximately $44,070.30. Such Adequate Assurance Deposit will further assure the Utility Providers of payment for postpetition services.

68.     Furthermore, I believe the proposed adequate assurance procedures described in the Utilities Motion (the "Adequate Assurance Procedures") are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services. If the Adequate Assurance Procedures are not approved, the Debtors will likely be confronted with and forced to address numerous requests by their utility providers at a critical time for their business. The Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether. Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

      c.     Cash Collateral Motion

69.     In the *Debtors' Emergency Motion (I) for Entry of Agreed Interim Order and Final Order (I) Authorizing Post-Petition Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Establishing Procedures for Notice of Proposed Final Order, and (V) Granting Related Relief* ("Cash Collateral Motion"), the Debtors are seeking interim and final orders, among other things, authorizing the post-petition use of cash collateral and granting liens on unencumbered assets and other protections as adequate protection for the use of cash collateral.  The Debtors commenced these chapter 11 cases with approximately $7 million in cash, all of which is cash collateral of BANA (the "Cash Collateral").

70.     The Debtors and BANA have agreed to the use of Cash Collateral on an interim basis to fund working capital, general corporate purposes, operating expenses, and administrative

costs and expenses of the Debtors consistent with the cash flow budget (the "Budget"). My team and the professionals at Getzler prepared the Budget. I am familiar with its contents and agree that the Budget represents the expected receipts and disbursements by the Debtors for the period shown, subject to periodic updates as agreed with BANA and as provided in the Proposed Interim Order.

71.     The use of all Cash Collateral is subject to the Budget. In return, the Debtors have agreed to provide BANA an adequate protection package to protect against the post-petition diminution in value of Pre-petition Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay: including liens on the Pinnacle Park Land, replacement liens, superpriority claims under section 507(b) of the Bankruptcy Code, payment of interest and attorneys' fees on the Loan, and continued access to information and financial reporting (collectively, the "Adequate Protection").

72.     In my business judgment, the proposed Adequate Protection to be provided for the benefit of BANA is fair, reasonable, and appropriate. The Debtors' provision of Adequate Protection is not only necessary to protect against diminution in value, but is also fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral for the benefit of their estates and all parties in interest.

73.     The preservation, maintenance, and enhancement of the value of the Borrowers' assets are of the utmost significance and importance. The Debtors lack sufficient available sources of working capital, however, to carry on the operation of their business without the use of Cash Collateral. Moreover, the Debtors' need to use Cash Collateral is immediate. Absent the ability to use Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors and their estates would be inevitable.

74.     The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Pre-petition Collateral and to use the same to pay operations costs and other expenses related to Borrowers' Properties, all of which constitute Pre-petition Collateral under the Loan Documents and, accordingly, are subject to the valid and perfected Pre-petition Liens. Access to Cash Collateral will allow the Debtors to continue operating their business in the ordinary course to the benefit of the Debtors' estates and their stakeholders.

75.     It is my understanding that BANA consents to the Debtors' use of Cash Collateral, subject to the terms and limitations set forth in the Proposed Interim Order.  Because use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Secured Lender, I believe the Proposed Orders should be approved.

76.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, and should be granted.

77.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization, and (c) is in the best interest of the Debtors' estates and stakeholders. I have reviewed each of the First Day Motions and the facts set forth therein are true and correct to the best of my knowledge, information, and belief after reasonable inquiry and incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts set forth in such motions. Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

Dated: August 6, 2024

By _____

Charles Haddad